14-3751-cv
Lynch v. Ackley

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: May 8, 2015                    Decided: January 28, 2016)

Docket No. 14-3751-cv

---------------------------------------------------------------X

TODD LYNCH,

        *Plaintiff-Appellee,*

v.

MARGARET ACKLEY,

        *Defendant-Appellant,*

CITY OF NEW LONDON,

        *Defendant.*

---------------------------------------------------------------X

Before: LEVAL, LOHIER, and DRONEY, *Circuit Judges*:

Defendant Margaret Ackley, Police Chief of New London, Connecticut, appeals from the order of the United States District Court for the District of Connecticut (Shea, *J.*) denying her motion for summary judgment to have the suit dismissed by reason of her qualified immunity. The suit, brought by a police officer under 42 U.S.C. § 1983, claims unconstitutional retaliation for his criticisms of the defendant's performance as chief. *Held*, the district court erred in denying qualified immunity because there was no clearly established precedent at the time of the defendant's conduct that her conduct violated constitutional norms. REVERSED and REMANDED.

        MICHAEL J. ROSE, Rose Kallor, LLP, Hartford, CT, (Allison L. Pannozzo, *on the brief*), for *Defendant-Appellant*.

        CHRISTINE S. SYNODI, Synodi & Videll, LLC, Waterford, CT, for *Plaintiff-Appellee*.

1

1    Leval, *Circuit Judge*:

2        Defendant Margaret Ackley, Chief of the New London Police Department ("NLPD"),

3    appeals from the order of the United States District Court for the District of Connecticut (Shea,

4    *J.*) denying her motion for summary judgment on the ground of qualified immunity. The

5    plaintiff, Todd Lynch, a police officer and a member and officer of the police union, alleges

6    under 42 U.S.C. § 1983 (as well as making claims based on Connecticut law) that Ackley

7    violated his First Amendment rights by retaliating against him for various episodes of speech

8    critical of Ackley's performance as Chief. Ackley moved for summary judgment dismissing the

9    § 1983 claims by reason of qualified immunity. The district court concluded that Lynch made a

10   *prima facie* case for unconstitutional retaliation and that factual issues in dispute prevented the

11   court from ruling on whether Ackley was entitled to qualified immunity under *Pickering v.*

12   *Board of Education*, 391 U.S. 563 (1968). The court therefore reserved decision on Ackley's

13   qualified immunity defense until a jury could resolve the factual issues at trial.

14       The court did not correctly apply the law for determining whether a state actor is entitled

15   by reason of qualified immunity to dismissal of a suit charging her under § 1983 with

16   unconstitutional conduct. The defendant was entitled to have the court construe disputed facts in

17   the light most favorable to the plaintiff and dismiss the claim if, at the time of the defendant's

18   conduct, the law was unclear whether the facts, so construed, constituted a violation of the

19   plaintiff's constitutional rights. We conclude that Ackley established her entitlement to summary

20   judgment on Lynch's § 1983 claims by reason of her qualified immunity.

21

22

2

1                                           **BACKGROUND**

2   **I.**      **Factual Background**

3          Plaintiff Lynch has been a New London patrolman and canine handler (K-9) since 2007,

4 having previously served in the Connecticut State Police. In March 2011, he became Vice

5 President of the New London Police Union, AFSCME Local 724 (the "Union"), and became

6 President in November 2011. Defendant Ackley has been Chief of the NLPD since June 2009.

7 Lynch submitted evidence showing that over a period of roughly three years beginning in August

8 2010, he spoke on eight occasions, either publicly or in union meetings, criticizing Ackley's

9 performance of her responsibilities, and evidence sufficient for a factfinder to find that Ackley

10 retaliated. Those episodes of speech and associations by Lynch and Ackley's alleged retaliatory

11 actions were as follows.[1]

12          (1) In August 2010, Lynch advocated among the union membership that the Union assert

13 a grievance protesting Ackley's uninvited presence at a union meeting convened to discuss the

14 NLPD's flex-time policy. Lynch asserts that, as retaliation, the department, claiming to be acting

15 in compliance with the terms of the Union's collective bargaining agreement (the "CBA"),

16 revoked compensation time accrued by him and by two other K-9 officers.

17          (2) At a September 2010 union meeting, Lynch asked that the Union consider a no-

18 confidence vote against Ackley, expressing lack of confidence in her leadership. Later that

---

[1] At various times in the proceedings below, Lynch raised three additional instances of speech, including his speech at a March 2011 city council committee meeting, his September 2011 call for a no-confidence vote, and his speech during union negotiations in June 2013. The district court ruled that Lynch either waived his arguments with respect to these instances or failed to

1    month, Lynch was denied paid leave to attend the funeral of a former state police classmate, and

2    was not allowed to attend a K-9 conference. He was also advised in October that he would not

3    receive a $500 insurance stipend because he had not properly opted out of his insurance plan

4    during the open enrollment period.

5        (3) In June 2011, the Union, with Lynch now serving as Vice President, endorsed the

6    mayoral candidacy of City Councilor Michael Buscetto, who was an openly avowed critic of

7    Ackley. In August and September 2011, in alleged retaliation Ackley sent emails to Kathleen

8    Mitchell, a local political commentator, suggesting that Mitchell submit Freedom of Information

9    requests to obtain civilian complaints filed against Lynch and the NLPD's K-9 unit.[2]

10        (4) In September 2011, the Union sponsored a paid advertisement in *The Day*, a New

11    London newspaper, titled "Open Letter to the Citizens of New London," which questioned

12    Ackley's leadership and asserted that her lack of judgment was negatively affecting police

13    operations and public safety. The following day, Ackley sent Mitchell an email suggesting that

14    she investigate Lynch's time sheets from the time of his service in the Connecticut State Police.

15    In October, Ackley eliminated the day shift to which Lynch was assigned.[3] Ackley later ordered

16    Deputy Chief Marshall Segar to investigate Lynch's use of union-business leave.

---

present sufficient evidence on them. Because Lynch provides no basis for showing that the district court erred in that reasoning, we do not address those instances.

[2] Lynch also alleges that Ackley prevented him from securing locations and equipment for K-9 training and deprived him of control over K-9 records and the NLPD's drug safe. However, these events allegedly took place before the union's endorsement in June 2011, and seem to relate only to Lynch's claims of retaliation for Lynch's March 2011 ascendancy to vice presidency of the union—claims that Lynch does not press on appeal.

[3] Lynch does not dispute that his request to be placed on another squad's day shift was subsequently granted.

(5) In February 2012, Lynch wrote to the mayor accusing Ackley of violating New London Executive Order No. 004, which prohibits officers from inquiring about an individual's immigration status unless it directly pertains to a criminal investigation. The letter noted that, in view of a police officer's duty to inform the chain of command of violations of the law, Lynch was obligated to bring Ackley's violation of law to the mayor's attention, as the mayor was at the top of the chain of command. Ackley, allegedly in retaliation, then ordered that a sergeant be present for all K-9 training, urged the mayor and city council to reduce the K-9 unit's budget, and, in response to the mayor's request, sent him statistical information reflecting a racial disparity in bites by K-9 dogs.

(6) In September 2012, Lynch wrote to the mayor on behalf of the Union, expressing the Union's concern that the NLPD's depleted officer ranks were jeopardizing public safety, and later, at the city council's request, Lynch participated in an October 2012 public safety committee ("PSC") meeting discussing the issues raised in Lynch's letter. Ackley then denied Lynch overtime pay for attending the PSC meeting, and in November removed certain K-9 unit records from his control.

(7) In May 2013, Lynch spoke at a PSC meeting on whether civilian complaints against officers should be discussed in open or executive session. Ackley later revoked Lynch's union business leave and placed him on AWOL status when he did not return to work as ordered after a collective bargaining meeting broke down.

(8) Finally, in June 2013, speaking at another PSC meeting, Lynch spoke of low police department morale and a high turnover rate of officers, and expressed concern that two dogs from the K-9 unit had been forced to retire. Ackley then limited K-9 unit training. In addition,

1   when asked for guidance by a mayoral assistant who had received a Freedom of Information

2   request from a reporter for *The Day*, Ackley advised him to proceed in accordance with City

3   policy. The reporter then published an article discussing racial disparity in bites by K-9 dogs,

4   focusing on an incident involving Lynch and his K-9 dog.

5   **II.     Procedural History**

6       On March 15, 2012, Lynch filed a complaint in Connecticut Superior Court alleging,

7   *inter alia*, a claim against Ackley and the City of New London (the "City") under § 1983 for

8   First Amendment retaliation.[4] Defendants removed the action to the federal district court, and

9   Ackley moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the First Amended

10  Complaint on the basis of qualified immunity. The district court (then Arterton, *J.*) denied the

11  motion.[5] Lynch then filed this Second Amended Complaint, which added allegations that Ackley

12  retaliated against him for two new instances of speech. Ackley renewed her motion, now seeking

13  dismissal of the Second Amended Complaint. The district court (Shea, *J.*) denied the motion.

14      At the conclusion of discovery, Ackley moved for summary judgment, arguing, with

15  respect to Lynch's § 1983 claims, that her conduct did not violate the First Amendment and that,

---

[4] The complaint also included claims for libel *per se* and under Conn. Gen. Stat. § 31-51q, which imposes liability on public employers who discipline or discharge an employee on account of the employee's exercise of speech rights protected by the United States Constitution or the Connecticut Constitution. Those claims are not at issue in this appeal, and we leave it to the district court to consider what impact, if any, our ruling has on Lynch's § 31-51q claims on remand.

[5] At oral argument of this appeal, Lynch argued that Judge Arterton's denial of Defendants' motion to dismiss the First Amended Complaint created "law of the case" on the issue whether Lynch's speech was made as a citizen on a matter of public concern. We reject that argument. Judge Arterton ruled only that the court was unable to make a determination *at the pleading*

1    in any event, she was entitled to have the case against her dismissed by reason of her qualified

2    immunity. The district court denied Ackley's motion. *Lynch v. Ackley*, No. 3:12-CV-537 (MPS),

3    2014 WL 4782812 (D. Conn. Sept. 24, 2014). The court ruled that Lynch's speech was protected

4    from retaliation by the First Amendment and that Lynch raised genuine issues of fact as to

5    whether Ackley's conduct amounted to an adverse employment action, whether Ackley had a

6    retaliatory motive for taking those actions, and whether, under the *Pickering* balancing test,

7    Ackley's interests in preventing disruption of the operations of the department clearly

8    outweighed Lynch's interests in speaking on matters of public concern. As the result of these

9    disputed issues of fact, the court reasoned that it could not yet determine whether Ackley

10   violated Lynch's First Amendment rights. With respect to Lynch's claim of qualified immunity,

11   the court similarly ruled that, because there were disputed issues of fact, it could not determine

12   whether Lynch's actions contravened law that was clearly established at the time. The court

13   denied Ackley's motion. Ackley then brought this interlocutory appeal challenging the district

14   court's denial of qualified immunity.

15                                    **DISCUSSION**

16   **I.       Appellate Jurisdiction**

17           Before reaching the merits of Ackley's appeal, we must address Lynch's contention that

18   we lack jurisdiction to review the district court's ruling at this stage. Lynch argues that there was

19   no appealable final decision below because the district court rested its denial of qualified

---

*stage. See Lynch v. Ackley*, No. 3:12-CV-537 (JBA), 2012 WL 6553649, at *4-6 (D. Conn. Dec. 14, 2012).

1    immunity on its finding that factual disputes underlying the *Pickering* balancing test precluded it

2    from determining whether there was a constitutional violation as a matter of law. We disagree.

3         "A district court's denial of a claim of qualified immunity, to the extent that it turns on

4    an issue of law, is deemed an appealable 'final decision' within the meaning of 28 U.S.C. § 1291

5    notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

6    This exception is justified by the fact that because qualified immunity is not only a defense to

7    liability, but also provides immunity from suit, an important part of its benefit is effectively lost

8    if a case is erroneously permitted to go to trial; thus, the defendant's entitlement to qualified

9    immunity should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*,

10   555 U.S. 223, 231-32 (2009). Whether an asserted constitutional violation was clearly

11   established at the time of the defendant's challenged conduct may be a purely legal question.

12   *Martinez v. Simonetti*, 202 F.3d 625, 632 (2d Cir. 2000). "[A]s long as the defendant can support

13   an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the

14   plaintiff's version of the facts that the district judge deemed available for jury resolution, an

15   interlocutory appeal is available to assert that an immunity defense is established as a matter of

16   law." *Smith v. Edwards*, 175 F.3d 99, 104-05 (2d Cir. 1999) (quotation marks omitted).

17   Adjudication of Ackley's motion for qualified immunity does not need to await jury resolution

18   of disputed factual issues. If on Lynch's version of disputed facts—accepting reasonable

19   inferences most favorable to him—there was no clear law at the time prohibiting Ackley's

8

1    conduct, then Ackley is entitled to qualified immunity. Ackley's motion can be adjudicated on

2    this basis as a pure question of law, and this appeal is properly before us.[6]

3    **II.    The Law of Unconstitutional Retaliation for Speech**

4    The Supreme Court has long recognized that the First Amendment affords a degree of

5    protection to public employees to exercise the right of free speech without risk of retaliation by

6    the State employer if the employee's speech in question is "on matters of public interest." *See*

7    *Pickering*, 391 U.S. at 568. At the same time, however, "the State has interests as an employer in

8    regulating the speech of its employees that differ significantly from those it possesses in

9    connection with regulation of the speech of the citizenry in general." *Id.* Thus, while those who

10    "accept[] public employment . . . do[] not check all of their First Amendment rights at the door,"

11    nonetheless "a citizen, upon entering government service, by necessity must accept certain

12    limitations on his or her freedom." *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011) (internal

13    quotation marks and citations omitted). In adjudicating the rights of public employees to speak

14    without facing retaliation from a government employer, courts attempt "to arrive at a balance

15    between the interests of the [employee], as a citizen, in commenting upon matters of public

16    concern and the interest of the State, as an employer, in promoting the efficiency of the public

---

[6] *Locurto v. Safir*, 264 F.3d 154 (2d Cir. 2001), cited by Lynch, does not conflict with our acceptance of jurisdiction. In that case, the defendants appealed the district court's denial of qualified immunity at summary judgment only on the ground that their assessment of the disruption caused by the plaintiffs' speech was objectively reasonable under *Pickering*. *Id.* at 168. We dismissed the portion of the appeal challenging that ruling because the defendants' subjective intent was a factual issue that precluded resolution on the *Pickering* test as a matter of law. *Id.* at 169-70. Here, in contrast, the basis for Ackley's appeal is that, on Lynch's version of the facts, Lynch did not establish a violation of a federally protected right and that any such violation was not based on clearly established law. Both are issues that are capable of resolution as a matter of law.

1 services it performs through its employees." *Pickering*, 391 U.S. at 568. Courts must weigh the

2 employee's speech interests against the government's interest in "effective and efficient

3 fulfillment of [its] responsibilities to the public, including promoting efficiency and integrity in

4 the discharge of official duties, and maintain[ing] proper discipline in public service." *Lane v.*

5 *Franks*, 134 S. Ct. 2369, 2381 (2014) (internal quotation marks and alterations omitted).[7]

6       The Supreme Court has identified a further limitation on the public employee's First

7 Amendment right to be free of retaliation for speech. In *Garcetti v. Ceballos*, the Court held that

8 "when public employees make statements pursuant to their official duties, the employees are not

9 speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

10 communications from employer discipline." 547 U.S. 410, 421 (2006). "When a public

11 employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to

12 speech by citizens who are not government employees." *Id.* at 424. In such circumstances, to

13 require a "delicate balancing of the competing interests surrounding the speech and its

14 consequences" (as required when employees speak as citizens) "would be to demand permanent

15 judicial intervention in the conduct of governmental operations to a degree inconsistent with

16 sound principles of federalism and the separation of powers." *Id.* at 423.

17       In pursuit of this balance the Supreme Court has identified three circumstances in which

18 public employee speech is not protected from retaliation by State employers. First, speech about

19 *personal* matters, as opposed to "matters of public concern," is not protected from retaliation.

---

[7] *Lane* was decided after the events in question in this case, and does not bear on the court's analysis of qualified immunity. We quote it here for its helpful explanation of the law established by *Pickering*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and their progeny.

1    *Connick v. Myers*, 461 U.S. 138, 147 (1983).  Second, even speech on matters of public concern

2    is not protected from retaliation unless the employee's First Amendment interests outweigh

3    government employers' legitimate interests in efficient administration. *Pickering*, 391 U.S. at

4    568. Third, speech made by employees "pursuant to . . . official duties" rather than "as a private

5    citizen" is not protected from retaliation.[8] *See Garcetti*, 547 U.S. at 421-22.

## III.    Qualified Immunity

7        A state actor charged under § 1983 with violating a plaintiff's constitutional rights is

8    entitled to have the action dismissed on the basis of qualified immunity if at the time of the

9    challenged conduct there was no "clearly established law" that such conduct constituted a

10   constitutional violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This is so even if the

11   court would conclude that, under law at the later time of the court's ruling, the defendant's

12   conduct would be found to violate the Constitution. *Id.* at 818-19. This rule is based on the

13   proposition that public officers should freely act in pursuance of their duties without fear of

---

[8] To prevail on a claim, the employee must also prove that she has suffered an adverse employment action, for which the speech was a motivating factor. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2003). Moreover, as a prerequisite to this whole analysis, the speech must come within the protection of the First Amendment to begin with. *See Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). This element is rarely in dispute, as practically all speech enjoys some First Amendment protection—with rare exceptions for such things as obscenity, fighting words, and yelling "fire" in a movie theater. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). And perhaps because it is hardly ever in dispute, it is generally assumed, rather than explicitly stated, that this is an essential element of the claim. A semantic confusion does, however, often arise in the explanation of a ruling on a State employee's claim of unconstitutional retaliation for speech. Courts sometimes characterize the determinative question in § 1983 First Amendment retaliation suits as whether the employee speech at issue was "constitutionally protected." In most cases, such words seem intended as shorthand for whether the speech was constitutionally protected *from employer retaliation*. The test for

11

1   being held liable for damages under constitutional standards of which they have no notice

2   because the standards were not yet developed at the time of their conduct. *See Ashcroft v. al-*

3   *Kidd*, 131 S. Ct. 2074, 2085 (2011). We have ruled that the need for "clearly established" law is

4   satisfied if the law on the subject was defined at the time with reasonable clarity or clearly

5   foreshadowed in rulings of the Supreme Court or the Second Circuit,[9] so that the defendant

6   should have understood that her conduct was unlawful. *See Looney v. Black*, 702 F.3d 701, 706

7   (2d Cir. 2012); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997).

8   **IV.     Application of Qualified Immunity to Lynch's First Amendment Claims**[10]

9           Ackley contends she is entitled as a matter of law to dismissal of Lynch's First

10  Amendment claims by reason of qualified immunity. She argues that, construing the facts in the

11  light most favorable to Lynch, her allegedly retaliatory actions did not violate constitutional

12  standards that were clearly established at the time. We agree that there was no clear law at the

13  time of the events establishing that Ackley's conduct constituted a First Amendment violation,

---

establishing unconstitutional retaliation for an employee's speech is far more stringent than the test for establishing that speech enjoys protection under the First Amendment.

[9] In some circumstances, decisions of other circuits can "clearly establish" law for this circuit. *See Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014).

[10] We review de novo a district court's denial of qualified immunity. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006). Because Ackley's motion was for summary judgment, we construe the evidence in the light most favorable to Lynch. *See id.* Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

1  and we express no view on whether Ackley's alleged conduct should be found to violate the First

2  Amendment.[11]

3       With respect to what may be Lynch's strongest claim for protection from retaliation—his

4  claim that Ackley retaliated against him for his perceived role in the Union's endorsement of

5  Buscetto for mayor—there was no clear law as to whether Ackley's alleged retaliatory actions

6  constituted *prohibited* retaliation because Ackley's alleged retaliatory acts were limited to her

7  exercise of her own First Amendment right to defend herself against Lynch's attacks. Her speech

8  in defending herself involved core First Amendment issues of public importance. With respect to

9  Lynch's claim relating to retaliation for a union grievance, the grievance he expressed was not

10 clearly a matter of public concern under *Pickering*. Finally, with respect to Lynch's remaining

11 claims, we find that because Lynch's speech interfered significantly with Ackley's ability to

---

[11] Prior to the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), under the rule of *Saucier v. Katz*, 533 U.S. 194 (2001), an inferior federal court was obligated to give an advisory ruling whether the challenged conduct amounted to a constitutional violation before considering whether the defendant was entitled to qualified immunity because of the absence of clearly settled law to that effect at the time of the conduct. *Id.* at 201. In *Pearson*, however, the Supreme Court rescinded that requirement, giving courts discretion whether to follow the *Saucier* formula or go directly to the question whether the law was clearly established at the time. *Pearson*, 555 U.S. at 236. The Supreme Court's reason for originally adopting the *Saucier* rule was to avoid having unconstitutional conduct go repeatedly unremedied if courts could repeatedly rule that the defendant's qualified immunity made it unnecessary to reach the question whether the defendant's conduct in fact violated the Constitution. *See id.* at 232 (citing *Saucier*, 533 U.S. at 201). In this case, however, there is little likelihood that frequently repeated instances of questionable conduct would repeatedly escape review. Qualified immunity applies only to a plaintiff's claim against an individual state actor for damages. It has no application when the suit is brought against a municipality, nor when the suit seeks injunctive relief. *See Owen v. City of Independence*, 445 U.S. 622, 637-38 (1980). Accordingly, if other plaintiffs brought allegations similar to Lynch's, qualified immunity would not be available in the very likely event that those plaintiffs sought damages against the municipality or injunctive relief. It appears there is little likelihood of the circumstance *Saucier* was designed to prevent.

13

1    effectively run the NLPD, she was arguably entitled to retaliate under *Pickering*'s balancing test,

2    even under the version of the facts most favorable to Lynch.

3       **A.     The Union's Endorsement of Buscetto**

4        Lynch claims that Ackley's retaliation for his perceived role in the Union's endorsement

5    of Councilman Steve Buscetto for Mayor of New London failed to satisfy the three-pronged test

6    described above. The endorsement undoubtedly expressed a matter of public concern.

7    Endorsements of candidates for political office are at the core of First Amendment protected

8    speech. Lynch's role in the Union endorsement constituted speech as a citizen, rather than as an

9    employee speaking pursuant to employment duties, and an employee's First Amendment interest

10   in expressing support for a candidate for election to public office will, in most circumstances,[12]

11   outweigh the employer's interest in the efficient accomplishment of the public responsibilities of

12   the agency.

13        For his role in the Union's endorsement of Buscetto, Lynch alleges that Ackley

14   encouraged an investigative reporter to seek out and publish derogatory information about Lynch

15   relating to civilian complaints on his conduct as a K-9 officer. This allegedly retaliatory conduct,

16   however, consisted of Ackley's exercise of her own core First Amendment rights in a public

17   forum about a matter of public importance relating to employment to defend herself against

---

[12] We do not mean to suggest that a public employee's endorsement of a candidate for public office would *always* be protected from employer retaliation. If, for example, a governor's speechwriter or an elected district attorney's chief aide publicly endorsed the candidate opposing her boss's campaign for election, there would no doubt be a strong argument that such an affront sufficiently risked impairing the supervising official's performance of her public duties as to justify the aide's demotion or dismissal without offending the standards of the First Amendment.

1 Lynch's attacks. It is hard to see why in this context Ackley has any less entitlement to First

2 Amendment protection than Lynch.

3        To the extent Lynch argues that, notwithstanding his employment in government, he

4 retained free-speech rights guaranteed by the First Amendment, it appears to us that the same

5 argument is available to Ackley. Lynch contends Ackley was forbidden by the First Amendment

6 from taking retaliatory action against him, but it is hardly the conventional role of the First

7 Amendment to bar Ackley from exercising her free-speech rights in defense against Lynch's

8 attacks on her. In any event, we need not decide the issue. It suffices for our purposes that, given

9 the nature of Ackley's allegedly retaliatory speech, there was no clear law or precedent

10 communicating to Ackley that her exercise of free-speech rights about a matter of public

11 importance relating to employment in an effort to defend herself publicly against Lynch's attacks

12 violated Lynch's First Amendment rights. That absence of authority compels the grant of

13 qualified immunity to Ackley on this claim.

14        We recognize that adverse employment actions may include adverse actions taken

15 outside the employment context as well as harm to the incidents of employment. *See Burlington*

16 *Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). But it seems highly improbable

17 that the anti-retaliation component of the First Amendment may muzzle an employer's speech on

18 matters of public concern in this context, preventing her from engaging, or soliciting support,

19 against one who declared himself to be her foe in public debate. In other contexts in which

20 public officials have been sued under 42 U.S.C. § 1983 with allegations that their retaliatory

21 speech unconstitutionally violated the First Amendment rights of plaintiffs, we have ruled that

22 the speech of the defendants was protected by the First Amendment, while noting that such

15

1    protection was not absolute and that such retaliatory speech might be actionable notwithstanding

2    the First Amendment when it could "reasonably be interpreted as intimating that some form of

3    punishment or adverse regulatory action will follow the [plaintiff's] failure to accede to the

4    official's [desires]." *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).

5    And in *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999), we noted that,

6    notwithstanding First Amendment protection of legislators' "advocacy" and other forms of

7    speech related to affairs of government, protection might not extend to speech inviting "threats,

8    intimidation, or coercion." Another Circuit, in a similar context, noted a "possible exception" to

9    the First Amendment's protection of public officials' retaliatory speech when "the retaliatory

10   disclosure of information relates to those personal rights that can be deemed fundamental or

11   implicit in the concept of ordered liberty," such as when the retaliatory disclosures are

12   "sufficiently embarrassing, humiliating, or emotionally distressful." *Suarez Corp. Indus. v.*

13   *McGraw*, 202 F.3d 676, 688 (4th Cir. 2000) (internal quotation marks omitted).

14        The few arguably precedential rulings we have found have not tried to specify the limits

15   of the First Amendment's protection of retaliatory speech by public officials, and neither do we.

16   Nonetheless, the fact that Ackley's allegedly retaliatory speech involved efforts to defend herself

17   against the verbal attacks of an employee accusing of her of incompetence and bad

18   administration, and addressed matters of public importance relevant to the attacker's public

19   employment duties, tends to support her entitlement to First Amendment protection. We know of

20   no authority establishing the contrary. We therefore hold, in the absence of any clear authority

21   for Ackley's liability, that Ackley is entitled to qualified immunity as to this claim.

16

B.    **Filing of Union Grievances**

Lynch also claims that Ackley retaliated against him for various incidents of his union

activity, which included his filing a union grievance protesting Ackley's presence at a union

meeting discussing the Department's flex-time policy. It is far from clear that this grievance

asserted a matter of public concern, rather than a "personal grievance[]." *Ruotolo v. City of N.Y.*,

514 F.3d 184, 189 (2d Cir. 2008). Lynch contends his grievance expressed a matter of public

concern because management intrusion in union matters can "chill and deter union members

from openly discussing their positions." Joint App'x at 169. Labor versus management disputes,

needless to say, almost invariably involve a conflict between the labor force and management

over an issue that concerns the terms and conditions of employment. Such disputes often have a

strong flavor of "personal grievance" notwithstanding that the personal grievance is shared by

numerous employees. On the other hand, especially in the case of employment in a public

agency, which renders service to the general public, it is rarely difficult for a plaintiff to

construct an argument that the dispute is a matter of public concern, either because it relates to

the delivery of services to the public, or because it invokes basic aspects of the right to

unionization. Some such arguments might well be persuasive, others not. Suffice it to say about

Lynch's argument that it was unclear whether such a grievance should be viewed as a matter of

public concern for purposes of *Pickering* analysis.

Lynch's reliance on *Hoyt v. Andreucci*, 433 F.3d 320 (2d Cir. 2006), and *Clue v.*

*Johnson*, 179 F.3d 57 (2d Cir. 1999), is unavailing. The issue in *Hoyt* was very different from

this case. That case involved an employee who alerted the Albany County legislature that one of

the county's employees was disciplining corrections officers in an unlawful manner. The court

17

1  found that "concerns raised to the government about the lawfulness of public officials' actions"

2  were issues of public concern. 433 F.3d at 330. Lynch's grievance against Ackley does not

3  clearly implicate concerns remotely similar to *Hoyt*.

4      *Clue* gives Lynch no better support. *Clue* involved a claim of management retaliation

5  against a minority faction of the Transit Workers' Union, which sought to unseat union

6  leadership. The court held that the activity in question did implicate matters of public concern

7  because "[t]he intraunion dispute here did not merely involve internal union affairs," but rather

8  involved "a struggle over the labor policies of the Transit Authority and what role the [union]

9  ought to play in changing those policies." 179 F.3d at 61. The issue in *Clue* was nothing like

10  Lynch's grievance. Though the court said in dicta that "retaliation solely for union activity

11  clearly raises a public concern under *Connick*," *id.*, it obviously did not mean that all activities

12  undertaken through a union necessarily become matters of public concern merely by virtue of

13  their collateral connection to the union. *Cf. Borough of Duryea v. Guarnieri*, 564 U.S. 379, 428

14  (2011) ("A petition filed with an employer using an internal grievance procedure in many cases

15  will not seek to communicate to the public or to advance a political or social point of view

16  beyond the employment context."). Indeed, it recognized that some union activity was likely

17  unprotected from retaliation. *Clue*, 179 F.3d at 61.[13]

---

[13] A further question is where, as the law stood at the time of Ackley's actions, Lynch's union activities would have fallen under *Garcetti*'s classifications. *Garcetti* essentially divided all speech by employees into two categories—speech "pursuant to . . . official duties," which is ineligible for protection from retaliation, and speech "as a citizen," which is eligible and is protected from retaliation if the requirements of *Pickering* are met. 547 U.S. at 421-22. It is not clear that speech by employees in the role of union officers, involving advocacy as to the *terms and conditions of employment*, fits comfortably into either category. While such speech is not made pursuant to duties *imposed by the employer*, such speech *is* made pursuant to duties that

1    **C.    Lynch's Remaining Claims**

2    The remainder of Lynch's claims involve retaliation for communication with town

3    leaders or the public at large concerning Lynch's and the Union's contentions that Ackley was a

4    bad chief, and that her continuing presence in that position endangered the safety of NLPD

5    officers and the public. We assume—without holding—that each of these instances of speech

6    constituted speech as a citizen on a matter of public concern. Nonetheless we hold that, even

7    given the version of the facts most favorable to Lynch, Ackley's retaliatory actions were not

8    prohibited by clearly established law.

9    Under *Pickering*, Ackley was permitted to retaliate against Lynch's speech if Lynch's

10   speech interests were outweighed by the government's interest in "promoting the efficiency of

11   the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Lynch's

12   speech obviously threatened to disrupt Ackley's ability to administer the NLPD effectively.

13   Indeed, the whole *purpose* of Lynch's speech, as a union officer, was to undermine and impair

14   her authority over the Department. Lynch's opposition to Ackley was hostile and very public,

15   and included his efforts to persuade the executive and legislative authorities of New London to

16   block and countermand her policies. Even construing the evidence in the light most favorably to

---

arise from the employment relationship between management and the union membership—the
duty of union officers is to represent the membership in advocacy and negotiation as to the terms
and conditions of employment. Whether such speech belonged in the category of citizen speech,
eligible for protection from retaliation, seems to us to have been unclear at the time of Ackley's
actions.

The Supreme Court's later ruling in *Lane v. Franks* arguably narrowed the scope of ineligible
employee speech. But *Lane* was decided subsequent to Ackley's conduct. It therefore had no
bearing on the crucial issue for purposes of qualified immunity—whether the law at the time of

1    Lynch, his actions were sufficiently disruptive as to render at least unclear whether his free-

2    speech interest outweighed Ackley's interest in the effective management of the Police

3    Department.

4                                                          * * *

5         Because no authority clearly establishes that Lynch's interest in speech as a union officer

6    attacking Ackley's competence as chief outweighed Ackley's governmental interest in effective

7    administration of her department, Ackley is entitled to summary judgment on the ground of

8    qualified immunity.

9    **V.       Lynch's Freedom of Association Claim**

10        Lynch also claims unlawful retaliation for his associations with City Councilor Buscetto

11   and the Union. The sole associative activity with Buscetto cited by Lynch to justify his claim is

12   the union's endorsement of Buscetto as a mayoral candidate. This claim based on Lynch's First

13   Amendment association rights is subject to the same analysis as set forth above for Lynch's First

14   Amendment free-speech right based on the same incident.

15        As for Lynch's claim based on his association with the Union, he has made no showing

16   that Ackley retaliated against him *because of* his union membership, particularly as he has

17   presented no evidence that she retaliated against any other police officer for membership or for

18   holding office in the Union. We recognize that Lynch's evidence was sufficient to show that

19   Ackley retaliated against him for the *things he said* in the framework of the Union. There was no

---

Ackley's conduct gave her clear notice that her conduct violated Lynch's rights under the First
Amendment.

showing, however, that she retaliated because of his association with the Union.[14] Ackley was entitled to summary judgment on this claim whether on the theory of qualified immunity or on the merits.[15]

## CONCLUSION

For the foregoing reasons, the district court's ruling denying Ackley's motion to dismiss by reason of qualified immunity is REVERSED.

---

[14] Lynch's claim differs substantially from the union-based association claim at issue in *State Emp. Bargaining Agent Coalition v. Rowland*, 718 F.3d 126 (2d Cir. 2013), in which plaintiffs claimed that the state employer terminated approximately 2,800 unionized state employees, but no non-union workers. *See id.* at 130.

[15] We note, furthermore, that it is unclear whether, and if so, how, *Garcetti* applies to claims of retaliation against protected association.

21